declared to be so, or not so declared by any existing law, or by his own orders. Subsequently, in a speech in the house of lords, he expressed the same opinion, and added: "In fact, martial law means no law at all. Therefore, the general who declares martial law, and commands that it shall be carried into execution, is bound to lay down distinctly the rules and regulations according to which his will is to be carried out."

This being the nature and extraordinary character of martial law, which, as observed by Sir Matthew Hale, is not law, but something indulged rather than allowed as law, all authorities agree that it can be indulged only in case of necessity, and that, when the necessity ceases, martial law ceases. When a government or country is disorganized by war, and the courts of justice are broken up and dispersed, or are disabled, through the prevalence of disorder and anarchy, from exercising their functions, there is an end of all law; and the military power becomes a necessity, which is exercised under the form, and according to the practice and usage, of martial law. As has been said by a distinguished civilian, "when foreign invasion or civil war renders it impossible for courts of law to sit, or to enforce the execution of their judgments, it becomes necessary to find some rude substitute for them, and to employ for that purpose the military, which is the only remaining force in the community; and, while the laws are silenced by the noise of arms, the rulers of the armed force must punish, as equitably as they can, those crimes which threaten their own safety and that of society; but no longer." This necessity must be shown affirmatively by the party assuming to exercise this extraordinary and irregular power over the life, liberty and property of the citizen, whenever it is called in question. The nature of this responsibility was explained by the judge-advocate-general of England, before a committee of the house of commons, in the case of martial law declared in Ceylon, and the explanation has been approved by the law officers of the crown. In answer to a question put by Sir Robert Peel, he observed: "I believe the law of England is, that a governor, like the crown, has vested in him the right, where the necessity arises, of judging of it, and being responsible for his work afterwards, so to deal with the laws as to supersede them all, and to proclaim martial law for the safety of the colony." And, again, in answer to a question by Mr. Gladstone: "I say he is just as responsible as I am responsible for shooting a man on the king's highway who comes to rob me. If I mistake my man, and have not, in the opinion of the judge and jury who try me, an answer to give, I am responsible."

Applying these principles to the case in hand, I think that the record fails to show any power on the part of the military officer over the alleged crime therein stated, or any jurisdiction of the military commission appointed by him to try the accused. No necessity for the exercise of this anomalous power is shown. For aught that appears, the civil local courts of the state of South Carolina were in the full exercise of their judicial functions at the time of this trial, as restored by the suppression of the rebellion some seven months previously, and by the revival of the laws and the reorganization of the state government, in obedience to, and in conformity with, its constitutional duties to the Federal Union. Indeed, long previous to this, a provisional governor had been appointed by the President, who is commander-in-chief of the army and navy of the United States, (and whose will, under martial law, constituted the only rule of action,) for the special purpose of changing the existing state of things and restoring civil government over the people. In pursuance of this appointment, a new constitution had been formed, a governor and a legislature had been elected under it, and the state was in the full enjoyment, or was entitled to the full enjoyment, of all her constitutional rights and privileges. The constitution and laws of the Union were thereby acknowledged and obeyed, and were as authoritative and binding over the people of the state as in any other portion of the country. Indeed, the moment the rebellion was suppressed, and the government growing out of it was subverted, the ancient possession, authority and laws resumed their accustomed sway, subject only to the new reorganization or the appointment of the proper officers to give to them operation and effect. This reorganization and the appointment of the public functionaries, under the superintendence and direction of the President, as commander-in-chief of the army and navy of the country, who, as such, had previously governed the people of the state, from imperative necessity, by force of martial law, had already taken place, and the necessity no longer existed.

I have not deemed it necessary, if it were proper, to look into the merits of the offence charged against the prisoner, although it is insisted that it occurred in self-defence, and in resisting a violent assault upon himself. Let the prisoner be discharged.

## Case No. 4,304.
### Case of EGAN.